644 P.2d 1066

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**William Wayne GILBERT,
Defendant-Appellant.**

**No. 5410.**

Court of Appeals of New Mexico.

April 22, 1982.

Catherine Baker Stetson, D'Angelo, McCarty & Vigil, Albuquerque, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Heidi Topp Brooks, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

WALTERS, Chief Judge.

Defendant was charged with five counts of conspiracy: (1) to murder Peter McDevitt; (2) to murder Sgt. Ness; (3) to escape from jail; (4) to escape from the custody of a peace officer, and (5) to commit residential burglary. He was acquitted on Counts 1 and 3; he appeals his conviction on Counts 2, 4, and 5. We affirm.

Two points listed in the docketing statement but not briefed are deemed abandoned. *State v. Gonzales*, 96 N.M. 556, 632 P.2d 1194 (Ct.App.1981).

We discuss the five issues argued: Denial of pretrial motions to (1) elect or merge counts, and (2) dismiss charges of conspiracy because the crimes, if any, showed solicitation; (3) refusal to direct a verdict on Count 2; (4) denial of motion for mistrial, and (5) denial of motions for continuance and exclusion of alleged hearsay evidence.

80

FACTS

These conspiracy charges arose out of events which took place between April 30 and August 4, 1980, when defendant was incarcerated at the Bernalillo County Detention Center. There he met the two alleged co-conspirators, Samantha Fowler and Gregory Hughes. Both had entered guilty pleas prior to defendant's trial; they were the State's main witnesses in establishing the conspiracies.

Fowler testified that she met defendant while visiting another inmate at the Detention Center; she began visiting defendant once or twice a week. They communicated almost daily by phone. Defendant and Fowler discussed various ways that defendant might escape:

(a) Fowler would hide a gun in her wig and give it to defendant during a visit at the detention center.

(b) Fowler would buy rat poison, secrete it in a box of books and send the box to defendant, who would then drink some poison and have to be hospitalized. He would then escape from the hospital.

(c) During one of defendant's visits with Dr. Salazar, a psychiatrist in Albuquerque, Fowler would either walk in beforehand and make an appointment for her daughter and then hide a gun in the toilet stall; or she would break in the office at night and hide the gun for defendant to retrieve; or she would walk into the office while defendant was there, hold a gun on the police escort and help defendant escape.

(d) Fowler would plant a gun in the toilet stall in the Valencia County Courthouse before one of defendant's pre-trial appearances there, or have a male friend do it for her. She did call the friend, who told her he had planted the gun, but had later retrieved it.

(e) Defendant would ask the police officer who escorted him to the Valencia County Courthouse to stop at a hamburger stand on the way back to Albuquerque, and Fowler would be waiting there with a gun drawn on the officer.

Fowler also agreed to help murder Detective Sergeant Ness. Ness had obtained defendant's confession to several murders; defendant expressed a belief that if Ness were killed, the confessions could not be introduced against him at trial. Fowler and Gilbert arranged for Fowler to obtain bail money to get Gregory Hughes out of jail. Fowler would then call Ness and represent that she had information about a current case involving a missing girl. She would set up a meeting with Ness in some remote area, and then Hughes would kill him. Fowler did bail Hughes out of jail with money defendant had arranged for, and she discussed with Hughes the Ness murder and one of the escape plans.

Hughes met defendant while they were both in the Detention Center and they became good friends. They discussed both the escape and murder plans, and Hughes agreed to rescue defendant at the hamburger stand, or to plant the gun at the Valencia County Courthouse, or to effect defendant's escape from Dr. Salazar's office. He also agreed to kill Ness. Additionally, defendant and Hughes discussed killing Peter McDevitt, the administrator of defendant's wife's estate, who, for insurance coverage purposes was living at defendant's house in Los Lunas. Hughes agreed to burglarize the doctor's house next door to Gilbert's to obtain drugs for his own use, and to steal a gun for McDevitt's murder if he had not already obtained a weapon. After Hughes was bonded out of jail, he got drunk. The next day he went to Los Lunas and threatened McDevitt. While attempting to break into the neighboring house, he was discovered by the owner. Soon afterward, he was caught and arrested for breaking and entering. Hughes's arrest led to his disclosure of the crimes for which Gilbert was indicted.

1. *Denial of motion to elect or merge offenses.*

Defendant moved for an order requiring the State to elect or merge the various

counts or, in the alternative, to dismiss the indictment. Defendant's failure to include the transcript of the motion hearing would normally preclude review. N.M.R.Crim. App. 209, N.M.S.A.1978; *State v. Padilla*, 95 N.M. 86, 619 P.2d 190 (Ct.App.1980). We have ordered those records so that we may consider the merits, however, because the issue is jurisdictional. *State v. Jones*, 85 N.M. 426, 512 P.2d 1262 (Ct.App.1973).

It is the agreement constituting the conspiracy which the statute punishes. *State v. Ross*, 86 N.M. 212, 521 P.2d 1161 (Ct.App.1974). A conspiracy is a common design or agreement to accomplish an unlawful purpose or a lawful purpose by unlawful means. *State v. Thoreen*, 91 N.M. 624, 578 P.2d 325 (Ct.App.1978). *Thoreen* and *Ross, supra,* indicate that it is the object of the conspiracy which is examined when a court evaluates the number of possible conspiracies. Several illegal acts may be involved in reaching one goal. The test is whether the agreement in question has a single, unified purpose or a common end. *United States v. Morado*, 454 F.2d 167 (5th Cir. 1972).

Defendant relies on *Braverman v. United States*, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942), cited in *Ross, supra,* to support his position that although several illegal acts were contemplated there was only one object to be accomplished: "to free Gilbert and to do away with witnesses to his crime." Defendant argues that indictment on five counts of conspiracy instead of one violated his Fifth and Sixth Amendment rights and prejudiced the jury "into a false impression of massive illegality."

The issue is not, as suggested by the State in its answer to this point, whether the evidence supported the three conspiracies of which defendant was convicted. Rather, it is whether there were fewer than five conspiracies which should have been charged, thus making the indictment multiplicitous. *State v. Ross, supra.*

The evidence offered at trial showed at least five objects of as many agreements. 1) Defendant agreed with Hughes that McDevitt should be killed. 2) Although this murder involved to some extent the residential burglary, there was another object to the burglary. Hughes testified that he agreed to burglarize Dr. Henry's house to obtain the weapon, if necessary, to kill McDevitt, but that he also was to obtain drugs for himself. We do not find any evidence to support defendant's theory that the purpose of the burglary was to steal guns to use in the escape plans. Thus, there was evidence that the burglary was a separate agreement with a separate object. 3) Defendant agreed with both Fowler and Hughes to murder Ness in order to prevent defendant's confession from being admitted at trial on the charges for which defendant was being held. 4) Defendant reached at least two agreements with respect to his freedom, with both Fowler and Hughes. He and Fowler conspired to commit his escape from jail. 5) Defendant and Hughes conspired to free him from the custody of a police officer while being transported to the Valencia County Courthouse.

The evidence supports each count with which defendant was charged. That the jury acquitted him of the conspiracy to murder McDevitt and the escape from jail conspiracy, does not lead to a contrary conclusion. *State v. Leyba*, 80 N.M. 190, 453 P.2d 211 (Ct.App.1969). We hold that the trial court did not err in refusing to merge some or all of the conspiracy counts. *State v. Ross, supra.*

Concerning defendant's Fifth Amendment rights, there was no imposition of multiple punishments for the same offense. Each sentence imposed relates to a separate valid conspiracy conviction. Nor were defendant's Sixth Amendment rights violated; the indictment gave him fair notice of the charges on which he was to be tried and against which he would be required to defend. The fact that the indictment alleged two counts upon which defendant was acquitted did not result in prejudice to the defendant. *Cf. Leyba, supra.* The trial court did not commit error in refusing to dismiss the indictment on constitutional grounds.

## 2. Solicitation rather than conspiracy.

Defendant moved to dismiss the indictment on the theory that solicitation, as defined in § 30–28–3, N.M.S.A. (1981 Cum. Supp.), was the crime with which he should have been charged. The trial court denied his motion. As with the first point on appeal, we review this issue because it is jurisdictional. *State v. Jones, supra.*

Although defendant seemingly presents three grounds for the validity of this argument, he primarily argues that because he was incarcerated he could not participate in any conspiracy.

The first justification offered for the propriety of the motion is that the conspiracy statute, as opposed to the statute prohibiting criminal solicitation, is general rather than specific. Consequently, defendant says, *State v. Riley*, 82 N.M. 235, 478 P.2d 563 (Ct.App.1970), requires reversal for his convictions under a statute " 'dealing with a subject in general and comprehensive terms' " when another statute exists which deals with " 'the common subject matter in a minute way.' " (82 N.M. at 236, 478 P.2d 563.)

We do not agree that the acts prohibited are the same so as to call into play the rule that a defendant must be prosecuted under the special rather than the general statute. *State v. Riley, supra.* The solicitation statute prohibits conduct which, "with the intent that another person engage in conduct constituting a felony, . . . solicits, commands, requests, induces, employs or otherwise attempts to promote or facilitate another person to engage in conduct constituting a felony . . . ." Section 30–28–3, *supra.* Conspiracy, § 30–28–2, N.M.S.A. (1981 Cum.Supp.), "consists of knowingly combining with another for the purpose of committing a felony . . . ." For there to be a "knowing combination," there must be a common design or mutual agreement. *State v. Davis*, 92 N.M. 341, 587 P.2d 1352 (Ct.App.1978). The crime of solicitation does not require agreement; there need be only unilateral acts on the part of the accused of inducement or request for another to commit a felony.

Secondly, defendant claims the charges of conspiracy were insufficient because they did not allege that, in addition to defendant's "knowing combination" with another, the "other" agreed with him to commit one or more felonies. An indictment is sufficient if it charges by using the name given to the offense by statute, or by stating in the terms of the statute so much of its definition as is sufficient to give the court and the defendant notice of the offense intended to be charged. *State v. Blea*, 84 N.M. 595, 506 P.2d 339 (Ct.App. 1973). Each of the counts of the indictment met these *Blea* standards.

Regarding the primary argument that his confinement prevented him from aiding in the commission of any felonies outside the jail; ergo, he could not be guilty of conspiracy, defendant emphasizes the significance of the acts contemplated by or carried out as a result of a conspiracy, and overlooks the designation of conspiracy as an "initiatory crime," requiring only an agreement between defendant and one or more persons to commit a felony. Agreement is the gist of the crime. *State v. Dressel*, 85 N.M. 450, 513 P.2d 187 (Ct.App. 1973). An overt act is not required; the crime of conspiracy is complete when the felonious agreement is reached. *State v. Leyba*, 93 N.M. 366, 600 P.2d 312 (Ct.App. 1979). The evidence of the mutual agreements between defendant and the State's principal witnesses was overwhelming. His incarceration may have prevented his active participation in carrying out some of the acts of the conspiracies; it had no effect whatever in dampening his initiatory conspiratorial activity.

## 3. Right to directed verdict on Count 2.

During its deliberations, the jury sent a note to the court advising that it had found that defendant and Hughes had agreed to murder Ness, and that defendant and Fowler had agreed to murder Ness, but that neither Hughes nor Fowler actually had intended to "pull the trigger." It asked the court to "please instruct us re-

garding the proper verdict." In reply, the court directed the jury to reread and rely on the instructions previously given.

Defendant did not move for a directed verdict. He urges here that since Instruction 9 required the jury to find that defendant and another agreed to commit a murder *and* had the intent to do so, the jury's note conclusively established that one of the elements was not satisfactorily proven to the jury and a directed verdict should have been ordered. He characterizes the jury's note as a verdict reached.

The court did not err in its response to the jury's note. Instruction 9 contained more than the two matters cited by defendant. It also told the jury that "[a] calculated judgment and decision may be arrived at in a short period of time." It instructed that "deliberate intention refers to the state of mind of the defendant." We do not know what the jury's considerations were which influenced its ultimate verdict of guilty on this count when it reread the instructions as directed by the court. We are confident in holding, however, that a review of the evidence clearly supports the jury's verdict on this charge. An acquittal should be directed only when there are no reasonable inferences or sufficient surrounding circumstances from which to infer intent. *State v. Manus*, 93 N.M. 95, 597 P.2d 280 (1979).

## 4. *The motion for mistrial.*

Both Fowler and Hughes were asked on direct examination whether they had entered guilty pleas to charges of conspiracy. Defendant objected when Fowler was so examined, contending that the evidence amounted to judicial determination of the existence of the conspiracy charges against him. He did not object to Hughes's testimony. He asserts on appeal that the guilty plea evidence was inadmissible hearsay under N.M.R.Evid. 801(c), N.M.S.A.1978.

Neither answer was "a statement, *other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.*" Rule 801(c), *supra.* The state-

ments *were* made while the witnesses were testifying at trial; the witnesses were fully cross-examined regarding their pleas, and the defense rigorously attempted to impeach and discredit all of their testimony because of their admissions of guilt.

Defendant misconstrues the cases he relies on as establishing that it is error to admit evidence or take judicial notice of a witness's or "co-conspirator's" plea of guilt. He cites *State v. Urioste*, 94 N.M. 767, 617 P.2d 156 (Ct.App.1980); *State v. Richter*, 93 N.M. 55, 596 P.2d 268 (Ct.App.1979); and *State v. Jackson*, 47 N.M. 415, 143 P.2d 875 (1943), as well as numerous federal and state cases from other jurisdictions. The rule contended for is much too broad. None of the cases relied on by defendant disclose facts similar to the matter now under review. In *Urioste, supra*, one of the charges against defendant was conspiracy. On that count, an alleged co-conspirator was called but refused to testify. The court took judicial notice of his plea of guilty to conspiracy, and so advised the jury. This court held that informing the jury of the hearsay fact of the witness's plea of guilty was error because it deprived defendant of her right to confront the witness against her. The prosecutor made it clear in that case that evidence of the witness's plea of guilty was solely to prove the existence of the conspiracy charge against defendant.

In *Richter, supra*, the confessions of co-defendants who did not testify were introduced against both of them. Each confession implicated the other in the crime charged. The reception of such hearsay evidence was held to be error because it denied to each defendant his Sixth Amendment right of confrontation against the other.

And in *Jackson, supra*, a co-defendant charged separately with the same crime of receiving stolen money, who pleaded guilty on the morning of trial, was asked as a witness in Jackson's trial if he was the same person who had withdrawn his guilty plea and pleaded guilty "to this charge." (47 N.M. at 417, 143 P.2d 875.) From the facts recited in the case, it appears that this was

the only testimony elicited from the witness. Our Supreme Court held the error to be the allowance of evidence that "in another criminal case in which the defendant, Jackson, was not a party . . . the witness had pleaded guilty to the same offense of which the defendant was charged." Noting that the plea would authorize a court to sentence the witness, the court said:

[B]ut it was . . . particularly not admissible as to elements of the offense as against a person not a party to the proceeding.

 These cases and the others to which we have been referred leave no doubt that hearsay evidence of a co-conspirator's or co-defendant's guilty plea may not be admitted when the witness himself does not testify, nor when that evidence is offered solely to prove defendant's guilt. In this case, however, the purpose of questioning Fowler and Hughes regarding their guilty pleas clearly was not solely to prove existence of a conspiracy in which defendant participated; instead, the questions established the framework of the witnesses' credibility by which the jury could judge their testimony. N.M.R.Evid. 105, 607, and 609, N.M.S.A.1978. The defense used the opportunity for thorough cross-examination; it made the most of the witnesses' less-than-impeccable characters and their motives for testifying which attached to their admissions of guilt. *Compare United States v. Halbert*, 640 F.2d 1000 (9th Cir. 1981), and *State v. Fendler*, 127 Ariz. 464, 622 P.2d 23 (Ct.App.1980). The evidence was not hearsay and it was not elicited as substantive proof of defendant's guilt.

Additionally, the combination of defendant's failure to object to Hughes's testimony, and his failure to request a cautionary instruction limiting the purpose of which the evidence could be considered (*see* N.M. R.Evid. 105, *supra*), constitutes a sufficient basis to sustain the trial court's ruling on defendant's motion. *State v. Sandoval*, 88 N.M. 267, 539 P.2d 1029 (Ct.App.1975).

5. *Denial of continuance.*

 It is defendant's position that because Fowler and Hughes in their testimony alluded to two other persons they had brought into their plans to aid Gilbert's escape, whose names were first disclosed at trial, he should have been granted a continuance to find and interview those persons. He also characterizes the testimony given in this connection as hearsay, a characterization which we reject in one instance and excuse in the other. If any hearsay was admitted, it was specifically solicited by defendant during cross-examination. Defendant may not predicate error on his own conduct. *State v. Harrison*, 81 N.M. 324, 466 P.2d 890 (Ct.App.1970).

 Defendant had obtained full disclosure of the grand jury proceedings early in the case. Those tapes revealed the existence of the two theretofore unnamed persons referred to by Fowler and Hughes at trial. On refusal of defendant's motion for continuance, the court noted that the defense had not asked to depose either Fowler or Hughes to attempt discovery of the identities of their cooperating friends, nor had they made any investigation of the address (where Hughes's "friend" lived) which appeared in the police reports.

The sequence of the proceedings concerning the continuance requests justified the court's rulings. In the prosecution's opening statement, the jury was told that Fowler would testify she had asked someone to hide a gun at the Valencia County Court House, but she would not identify that person. The defense objected; the court sustained the objection and admonished the prosecution to refrain from stating whether the witness would refuse to identify the friend but to wait and see what happened when she took the stand.

On direct examination of Fowler, the State asked for a bench conference before reaching the evidence of the "friend's" participation. The jury was excused; Fowler refused to name him, saying she feared for her life. The court denied a motion for mistrial on the reasoning that defendant had not asked for limitation of opening statements and had long known of this piece of evidence from the grand jury testi-

mony. It did, however, grant a defense motion that testimony regarding Fowler's asking another to hide a gun be excluded. Thereafter, in cross-examination, when the defense requested permission to elicit information about Fowler's "friend," the court ruled, in a discussion outside the presence of the jury, that such cross-examination would be inconsistent with defendant's earlier objection, and that questions on that issue would not be allowed.

The defense ultimately withdrew its previous objection; Fowler disclosed her friend's name. Following completion of her testimony, the defense asked for the continuance or, alternatively, for mistrial. It was at that point that the trial court commented regarding defendant's familiarity with the grand jury evidence which revealed the existence of Fowler's unnamed friend, and his failure to seek discovery before he was "halfway through the trial and ... now want[ing] a continuance to go out and do your investigation." Upon reargument, the court again denied the request for continuance, explaining that it was "mere speculation" to assume that if Fowler's deposition had been ordered she would have asserted a Fifth Amendment privilege against testifying.

With regard to the Hughes testimony that he gave money to a friend to pay for a gun, drugs and lockpicks, that was not hearsay evidence. N.M.R.Evid. 801, *supra.* On cross-examination, Hughes gave the name and address of his friend. Not immediately thereafter, but following testimony of several other witnesses, defendant again moved for a continuance so he could find and subpoena Hughes's friend. Defendant admitted to the trial court that the reports earlier furnished to him had contained the address of Hughes's friend, and that his testimony was being sought by the defense for possible impeachment purposes only. The court denied that motion as well. All of the motions were again denied when renewed at the conclusion of the State's case.

The grant or denial of motions for continuance is a matter exclusively for the trial court to decide. *State v. Perez*, 95 N.M. 262, 620 P.2d 1287 (1980). *State v. Cochran*, 79 N.M. 640, 642, 447 P.2d 520 (1968), directed an analysis of the trial court's decision in the context of the rulings made here:

> The rule has been firmly established ... that a motion for continuance rests within the sound discretion of the trial court and its ruling will not be disturbed unless the record shows an abuse of discretion. ... The motion was denied because the appellant failed to show diligence in attempting to secure the witnesses. ... He had known for well over a month the need for calling the witnesses but had made no attempt to ascertain their availability prior to trial.

Upon the same reasoning, we hold the trial court did not abuse its discretion in this case.

Defendant's convictions are AFFIRMED.

HENDLEY and LOPEZ, JJ., concur.